**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO: 06-CV-60430-HUCK**

FILED by _____ D.C.
DKTG

JUL 5 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

CELLANTENNA CORP.,           )
       Plaintiff,         )
                        )
                        )
       v.                  )
                        )
FEDERAL COMMUNICATIONS       )
COMMISSION and THE UNITED STATES )
OF AMERICA,                   )
                        )
       Defendants.         )
_____)



## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

R. ALEXANDER ACOSTA
United States Attorney

PETER D. KEISLER
Assistant Attorney General

THEODORE C. HIRT
Assistant Branch Director

PETER T. WECHSLER (MA Bar)
Trial Attorney
United States Department of Justice
Civil Division
Email: peter.wechsler@usdoj.gov
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel.: (202) 514-2705
Fax: (202) 616-8470
Attorneys for Defendants

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ................................................................. 1

FACTS AND BACKGROUND ................................................................. 3

    A.    The Communications Act ................................................... 3

    B.    The FCC Regulations ......................................................... 5

    C.    The Homeland Security Act ................................................ 5

    D.    The FCC's Letter of Inquiry and CellAntenna's Response ................ 5

    E.    The Complaint .................................................................. 7

ARGUMENT ...................................................................................... 8

I.    PLAINTIFF LACKS STANDING TO ASSERT THE CLAIMS IN
THE COMPLAINT ........................................................................ 8

    A.    Article-III Standing Requires Plaintiff to Demonstrate an "Injury in Fact" ....... 8

    B.    Plaintiff Does Not Meet the Injury-in-Fact Component of Standing ................. 9

    C.    Plaintiff Lacks Standing to Assert Claims Based on Allegations as to
the Rights of Third Parties ................................................. 13

II.    THIS COURT LACKS SUBJECT-MATTER JURISDICTION OVER PLAINTIFF'S
CHALLENGE TO THE FCC REGULATIONS ........................................... 14

III.    PLAINTIFF FAILS TO STATE A CLAIM BECAUSE CONGRESS DID
NOT IMPLIEDLY REPEAL THE COMMUNICATIONS ACT BY
ENACTING THE HSA ..................................................................... 16

IV.    PLAINTIFF FAILS TO STATE A CONSTITUTIONAL CLAIM ...................... 20

V.      PLAINTIFF IS NOT ENTITLED TO AN INJUNCTION ............................................. 22

      A.      Because The Court Lacks Subject-Matter Jurisdiction Over the
            Complaint, the Requests for Preliminary and Permanent Injunctions
            Must Be Denied ............................................................................................. 22

      B.      Even If The Court Had Subject-Matter Jurisdiction, Plaintiff Has
            Failed To Establish Any Basis For Granting A Preliminary Injunction ........... 23

            1.      Plaintiff has failed to establish irreparable harm ................................... 24

            2.      The balance of harms favors the Government ........................................ 26

            3.      Plaintiff has no likelihood of success on the merits .............................. 26

            4.      The public interest supports denial of a preliminary injunction ........... 27

CONCLUSION ..................................................................................................................... 27

**TABLE OF CASES**

PAGE(S)

Abbott Laboratories v. Gardner, 387 U.S. 136 (1967) ................................................ 27

Allen v. Wright, 468 U.S. 737 (1984) ........................................................................ 8

American Bird Conservancy v. FCC, 408 F. Supp. 2d 987 (D. Haw. 2006) .............................. 15

Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531 (1987) ...................................... 23

Anderson v. Winter, 631 F.2d 1238 (5th Cir. 1980) .................................................. 22

Board of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356 (2001) ...................................... 21, 22

Borg-Warner Protective Services Corp. v. EEOC, 245 F.3d 831 (D.C. Cir. 2001) .................... 14

Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364 (11th Cir. 1997) .................. 10

Bywater Neighborhood Ass'n v. Tricarico, 879 F.2d 165 (5th Cir. 1989) .................................. 15

Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc., 467 U.S. 837 (1984) .............. 14

City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432 (1985) ............................................ 20, 21

City of Los Angeles v. Lyons, 461 U.S. 95 (1983) ................................................ 9, 24

Crawford Fitting Co. v. Gibbons, Inc., 482 U.S. 437 (1987) ...................................... 16

Dallas County, Alabama v. City Of Selma, __ F. Supp.2d __, 2006 WL 463869
  (S.D. Ala.) .................................................................................... 17

Ex Parte McCardle, 7 Wall. 506 (1868) .................................................. 22

FCC v. Beach Communications, Inc., 508 U.S. 307 (1993) ........................................ 21

FCC v. ITT World Communications, 466 U.S. 463 (1984) ........................................ 15

Frio Ice, S.A. v. Sunfruit, Inc., 918 F.2d 154 (11th Cir. 1990) ...................................... 23

Gifford-Hill & Co. v. Federal Trade Comm'n, 389 F. Supp. 167 (D.D.C. 1974) ...................... 27

Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003) ...................................... 10, 12, 17

iii

Harris v. Evans, 20 F.3d 1118 (11th Cir. 1994) ............................................................. 13, 14, 25

Heller v. Doe, 509 U.S. 312 (1993) ................................................................................. 22

J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, 534 U.S. 124 (2001) ....................... 16

Joel v. City of Orlando, 232 F.3d 1353 (11th Cir. 2000) ............................................... 21

Kaballer v. Busey, 999 F.2d 1417 (11th Cir. 1993) ....................................................... 15

Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375 (1994) ........................................... 9

Koziara v. City of Casselberry, 392 F.3d 1302 (11th Cir. 2004) .............................. 8, 9

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ............................................... 8, 9

Marsh v. Butler County, 268 F.3d 1014 (11th Cir. 2001) ................................... 10, 12, 17

Morton v. Mancari, 417 U.S. 535 (1974) ....................................................... 16, 17, 20

Muller v. Lujan, 928 F.2d 207 (6th Cir. 1991) .............................................................. 20

National Park Hospitality Ass'n v. Department of the Interior, 538 U.S. 803 (2003) ............... 27

NationsBank Corp. v. Herman, 174 F.3d 424 (4th Cir. 1999) ...................................... 26

Newdow v. Bush, 355 F. Supp.2d 265 (D.D.C. 2005) .................................................. 27

Nnadi v. Richter, 976 F.2d 682 (11th Cir. 1992) .......................................................... 26

O'Shea v. Littleton, 414 U.S. 488 (1974) ...................................................................... 9

Oladeinde v. City of Birmingham, 963 F.2d 1481 (11th Cir. 1992) ............................. 10

Pippin v. Playboy Entm't Group, Inc., 2003 WL 21981900 (M.D. Fla. 2003) ........... 25

Posadas v. Nat'l City Bank of N.Y., 296 U.S. 497 (1936) ............................................. 16

Powers v. Ohio, 499 U.S. 400 (1991) ..................................................................... 13, 14, 25

Radzanower v. Touche Ross & Co., 426 U.S. 148 (1976) ....................................... 16, 18, 19

Raines v. Byrd, 521 U.S. 811 (1997) ............................................................................. 9

iv

Renne v. Geary, 501 U.S. 312 (1991) ........................................................ 9

Ruckelshaus v. Monsanto Co., 467 U.S. 986 (1984) ................................. 16

Rucker v. Davis, 203 F.3d 627 (9th Cir. 2000) ......................................... 19

Sacramento Metro. Air Quality Mgmt. Dist. v. United States, 215 F.3d 1005 (9th Cir. 2000) .................................................................................................. 19, 20

Schwarz v. Kogan, 132 F.3d 1387 (11th Cir. 1998) .................................. 21

Siegel v. Lepore, 234 F.3d 1163 (11th Cir. 2000) .......................... 23, 24, 25

Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26 (1976) ............... 13

Smith v. Christian, 763 F.2d 1322 (11th Cir. 1985) ................................. 20

Snook v. Georgia Bank, 909 F.2d 480 (11th Cir. 1990) ........................... 25

St. Martin Evangelical Lutheran Church v. South Dakota, 451 U.S. 772 (1981) ................. 16, 18

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998) ......................... 8, 9, 22, 23

Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70 (D.C. Cir. 1984) .............. 15

Tom Doherty Assoc., Inc. v. Saban Entm't, Inc., 60 F.3d 27 (2d Cir. 1995) .............................. 25

Traynor v. Turnage, 485 U.S. 535 (1988) ........................................... 16, 19

US Ecology, Inc. v. U.S. Dep't. of Interior, 231 F.3d 20 (D.C. Cir. 2000) .................................... 9

Warth v. Seldin, 422 U.S. 490 (1975) ...................................................... 13

In re Waterfront License Corp., 231 F.R.D. 693 (S.D. Fla. 2005) .............................. 10

Watt v. Alaska, 451 U.S. 259 (1981) ....................................................... 16

West-Point Pepperell, Inc. v. Donovan, 689 F.2d 950 (11th Cir. 1982) ...................................... 23

Whitmore v. Arkansas, 495 U.S. 149 (1990) ..................................... 9, 12, 13

Wolff v. Cash 4 Titles, 351 F.3d 1348 (11th Cir. 2003) ............................ 13

## PRELIMINARY STATEMENT

The Communications Act of 1934, 47 U.S.C. §§ 301 et seq., authorizes the Federal Communications Commission ("FCC") to promulgate regulations governing the sale of devices that are capable of interfering with radio communications, id. § 302a(a), and exempts devices intended for use by the Federal Government, which devices are developed or procured under Federal Government standards designed to reduce interference with radio reception. Id. § 302a(c). Pursuant to the Act, the FCC promulgated regulations governing the sale of such "radiofrequency devices." 47 C.F.R. §§ 2.801 et seq. These regulations exempt devices intended for use by the Federal Government. 47 C.F.R. § 2.807.

Plaintiff, a private company that sells communication equipment, seeks to prevent the FCC from enforcing these provisions to regulate the sale of radiofrequency devices to state and local governments. See Comp. ¶¶ 12, 15, 25, 26, 34. Plaintiff asserts that, because the Communications Act exempts devices intended for use by the Federal Government but does not also exempt devices intended for use by state and local governments, the Act violates the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, and that the Communications Act was impliedly repealed by the Homeland Security Act of 2002, 6 U.S.C. §§ 101 et seq. Id. ¶¶ 25, 26.

Plaintiff's claims must be dismissed for lack of subject-matter jurisdiction or, alternatively, for failure to state a claim upon which relief can be granted.

1

First, plaintiff lacks standing to challenge these provisions. Plaintiff alleges that state and local government agencies contacted the company to explore the purchase of devices designed to disrupt cell phone communications. Id. ¶ 14. But plaintiff informed the FCC, in response to a letter of inquiry, that plaintiff does not sell such "jamming" devices to state and local governments, and that it complies with the Communications Act and the FCC regulations. Given these representations, plaintiff cannot establish that it suffered a legally cognizable injury as a result of any action taken by the FCC.

Second, to the extent that plaintiff seeks to challenge the FCC regulations, the Court of Appeals has exclusive jurisdiction over such a claim pursuant to the Hobbs Act, 28 U.S.C. § 2342(1), and 47 U.S.C. § 402(a).

Third, even if plaintiff had standing to raise these claims and the District Court had subject-matter jurisdiction over them, these challenged provisions of the Communications Act do not conflict with any provisions of the Homeland Security Act with respect to the FCC's statutory authority to regulate the sale of radiofrequency devices. Congress thus did not impliedly repeal the Communications Act by enacting the Homeland Security Act.

Fourth, even if plaintiff had standing to raise these claims and the District Court had subject-matter jurisdiction over them, these provisions of the Communications Act easily survive plaintiff's constitutional claims. Because these provisions do not target a protected class and do not implicate a fundamental right, courts apply the highly deferential rational-basis test to substantive due process and equal protection claims. Under that test, the challenged provisions are entitled to a strong presumption of validity. Congress was not required to exempt devices intended for use by state or local governments, particularly devices that were

2

not developed under Federal Government standards designed to reduce interference with radio reception, given the danger resulting from the sale of devices that are capable of interfering with radio communications.

Fifth, the Court should deny plaintiff's requests for preliminary and permanent injunctions. Due to the absence of subject-matter jurisdiction over the claims asserted in the Complaint, the Court must dismiss these claims in their entirety, including the requests for injunctions, which seek to bar the FCC from enforcing the Communications Act and the FCC regulations governing the sale of radiofrequency devices. In addition, plaintiff, having waited seven months before filing suit, has failed to meet its burden to demonstrate: (a) that it faces a substantial threat of irreparable injury if the injunction is not granted, (b) that such injury outweighs the harm that the injunction may cause the FCC, (c) that plaintiff has a substantial likelihood of success on the merits, and (d) that granting the injunction is not adverse to the public interest.

## FACTS AND BACKGROUND

A.   **The Communications Act**

Section 302a of the Communications Act of 1934, 47 U.S.C. §§ 301 et seq. (the "Communications Act"), provides in relevant part as follows:

(a) Regulations.

The Commission may, consistent with the public interest, convenience, and necessity, make reasonable regulations governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications," and that such regulations "shall be applicable to the manufacture, import, sale, offer for sale, or shipment of such devices . . . , and to the use of such devices.

3

(b) Restrictions.

No person shall manufacture, import, sell, offer for sale, or ship devices . . . , or use devices, which fail to comply with regulations promulgated pursuant to this section.

(c) Exceptions.

The provisions of this section shall not be applicable to . . . devices . . . for use by the Government of the United States or any agency thereof," and that devices for such use "shall be developed, procured, or otherwise acquired . . . under United States Government criteria, standards, or specifications designed to achieve the objectives of reducing interference to radio reception. . . .

47 U.S.C. § 302a.

Section 333 of the Communications Act provides that no person shall "willfully or maliciously interfere with or cause interference to any radio communications of any station licensed or authorized by or under this chapter or operated by the United States Government." 47 U.S.C. § 333.

Challenges to final orders of the FCC are governed by section 402 of the Communications Act, 47 U.S.C. § 402. With respect to final agency orders, the Act states that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission . . . shall be brought as provided by and in the manner prescribed" by 28 U.S.C. § 2342(1), which is part of the statute known as the Hobbs Act. 47 U.S.C. § 402(a). The Hobbes Act provides in turn that "[t[he court of appeal . . . has exclusive jurisdiction to enjoin, set aside, suspend, . . . or to determine the validity of . . . all final orders of the [FCC] made reviewable by" 47 U.S.C. § 402(a). 28 U.S.C. § 2342(1).

4

**B.**     **The FCC Regulations**

Pursuant to Section 302a of the Communications Act, the FCC promulgated regulations, which are found at 47 C.F.R. §§ 2.801 et seq., governing any person who sells, offers for sale, or distributes a "radiofrequency device," which is defined as "any device which in its operation is capable of emitting radio-frequency energy by radiation, conduction, or other means." Id. § 2.801. Consistent with the Communications Act, 47 U.S.C. § 302a(c), the FCC regulations do not apply to devices intended "for use by the Government of the United States or any agency thereof." 47 C.F.R. § 2.807(d); see also Comp. ¶¶ 10-11.

**C.**     **The Homeland Security Act**

The Homeland Security Act of 2002, 6 U.S.C. §§ 101 et seq. (the "HSA"), established the United States Department of Homeland Security, id. § 111(a), and assigned to that agency a primary mission that includes preventing terrorist attacks with the United States and reducing the vulnerability of the United States to terrorism. Id. §§ 111(b)(1)(A) and (B). In order to achieve that mission, the HSA authorized the Department of Homeland Security to work with other federal agencies, and to coordinate certain activities with state and local government agencies. See, e.g., 6 U.S.C. §§ 162, 182, 361; Comp. ¶¶ 18-21.

**D.**     **The FCC's Letter of Inquiry and CellAntenna's Response**

By letter to CellAntenna dated August 24, 2005 (the "letter of inquiry"), the Spectrum Enforcement Division of the FCC's Enforcement Bureau informed CellAntenna that the FCC was "investigating a complaint alleging that CellAntenna [was] marketing to law enforcement

---

[1] The FCC defined the term "marketing" to include the sale, offer for sale, or advertising. Letter at 1.

5

and other government agencies in the United States uncertified devices that intentionally cause radio frequency interference (cell phone jammers) in violation of . . . 47 U.S.C. § 302a(b) . . . and 47 C.F.R. § 2.803." Letter of August 24, 2005, at 1; Declaration of Joseph P. Casey ("Casey Decl."), Exhibit A; see also Comp. ¶ 27.  In the letter of inquiry, the FCC directed CellAntenna to provide certain information regarding its marketing or sale of such items, supporting its response with an affidavit or declaration under penalty of perjury, signed by an authorized representative with personal knowledge of the representations provided in the company's response, verifying the information therein.  Letter at 1, 4.

By letter dated September 13, 2005, to the FCC, CellAntenna's counsel responded to the FCC's letter of inquiry and submitted the Declaration of Howard Melamed, the company's president and CEO.  CellAntenna represented that it "has not distributed" and "does not distribute" uncertified devices that intentionally cause radio frequency interference ("Devices") to "any local or state government," and that the company "markets the Devices only insofar as it has held a strict intention to distribute them in the United States to the extent permitted by" the Communications Act and the FCC regulations.  Letter of September 13, 2005, at 5; Casey Decl., Exh. B.  The company also represented that, "[i]f CellAntenna receives any inquiry for the Devices . . . from sources other than the Federal Government, CellAntenna responds that . . . the Devices are exclusively intended for distribution to and use by the Federal Government, and cannot be purchased by anyone else in this Country."  Id at 3-4.

By letter to CellAntenna dated October 26, 2005, the Spectrum Enforcement Division of the FCC's Enforcement Bureau replied to CellAntenna's letter of September 13, 2005.  Casey Decl., Exh. C.  The FCC noted that CellAntenna "indicated that the radiofrequency transmitting

6

devices under investigation are not being marketed or sold in the United States to non-Federal Government entities," and that, if any such entity inquires, CellAntenna "informs the inquirer that the product can only be purchased by the Federal Government." Letter of October 26, 2005, at 1. The FCC stated that its Enforcement Bureau "was not planning to take further action regarding these matters," and that the FCC had "closed this investigation." The FCC noted that CellAntenna "should . . . not construe the closing of the investigation as a determination that a violation did not occur, and that the FCC "may take future action if the public interest so requires." Id. at 2.

   E.   **The Complaint**

   On April 4, 2006, CellAntenna filed the Complaint against the FCC and the United States, challenging the provisions of the Communications Act and the FCC regulations that govern the sale of devices capable of interfering with radio communications. See Comp. ¶¶ 7-11, citing 47 U.S.C. §§ 302a, 333; 47 C.F.R. § 2.807. In particular, CellAntenna seeks to prevent the FCC from enforcing these provisions with respect to the sale of such devices to state and local governments. Comp. ¶¶ 12, 15, 25, 26, 34. CellAntenna alleges that it "is engaged in the business of selling and distributing radio frequency communication equipment," including "devices . . . that are designed to deliberately jam or disrupt wireless communications," id. ¶ 7; that it is "well-known" that such devices can "disable remotely controlled improvised explosive devices," in other words, "bomb[s] designed to be detonated by the use of a remote cellular telephone," id. ¶ 13; and that "several state and local law enforcement agencies have contacted the company to explore the purchase of cellular jamming devices for law enforcement purposes." Id. ¶ 14. CellAntenna alleges that, as a result of its receipt of the FCC's letter of inquiry,

CellAntenna "has a reasonable apprehension of enforcement action by the FCC with respect to any sale of such equipment to governmental agencies not specifically exempted," id. ¶ 27, and that the company "suffers, and will continue to suffer adverse economic impact" from the prohibition of the sale of such devices to state and local agencies. Id. ¶ 28.

In Count I of the Complaint, CellAntenna seeks a declaratory judgment that, because the Communications Act does not exempt devices intended for use by state or local governments, id. ¶¶ 12, 15, these provisions violate the substantive due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, id. ¶ 25; or, alternatively, that the Communications Act was impliedly repealed by the Homeland Security Act of 2002. Id ¶ 26. In Count II of the Complaint, CellAntenna seeks preliminary and permanent injunctions preventing the FCC from enforcing these provisions of the Communications Act and the FCC regulations with respect to the sale of such devices to state and local government agencies. Id. ¶ 31.

<div align="center">**ARGUMENT**</div>

**I.      PLAINTIFF LACKS STANDING TO ASSERT THE CLAIMS IN THE COMPLAINT**

**A.      Article-III Standing Requires Plaintiff to Demonstrate an "Injury in Fact"**

Article III of the United States Constitution "confines the federal courts to adjudicating actual 'cases' and 'controversies.'" Allen v. Wright, 468 U.S. 737, 750 (1984). The "core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). The requirements for standing under Article III are: (1) that plaintiff suffered an "injury in fact"; (2) that there is a causal connection between the injury complained of, such that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely, as opposed to merely

<div align="center">8</div>

speculative, that the injury will be redressed by a favorable decision. Id. at 560-61; Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103-104 (1998); Koziara v. City of Casselberry, 392 F.3d 1302, 1304 (11th Cir. 2004). A "deficiency on any one of the three prongs suffices to defeat standing." US Ecology, Inc. v. U.S. Dep't. of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).

The "injury in fact" component of standing is the "[f]irst and foremost" requirement of the doctrine. Steel Co. v. Citizens, 523 U.S. at 104. To qualify as an "injury in fact," an "alleged injury must be legally and judicially cognizable." Raines v. Byrd, 521 U.S. 811, 819 (1997); see also Koziara, 392 F.3d at 1305. "This requires, among other things, that the plaintiff have suffered 'an invasion of a legally protected interest which is . . . concrete and particularized.'" Raines at 818, quoting Lujan v. Defenders of Wildlife, 504 U.S. at 560. In addition, the injury or threat must be "both 'real and immediate,' not 'conjectural' or 'hypothetical.'" City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983); O'Shea v. Littleton, 414 U.S. 488, 494 (1974) (internal citations omitted); Koziara, 392 F.3d at 1305. "A threatened injury must be 'certainly impending' to constitute injury in fact." Whitmore v. Arkansas, 495 U.S. 149, 158 (1990).

**B.     Plaintiff Does Not Meet the Injury-in-Fact Component of Standing**

As the party invoking federal jurisdiction, plaintiff bears the burden of establishing its existence. Steel Co. v. Citizens, 523 U.S. at 104; Koziara, 392 F.3d at 1304. At the pleadings stage, "[i]t is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke . . . the exercise of the court's remedial powers." Renne v. Geary, 501 U.S. 312, 315 (1991) (citation omitted); see also Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994) (on a motion to dismiss for lack of subject-matter jurisdiction, plaintiff bears the burden of proof as to jurisdiction).

9

In the Complaint, CellAntenna alleges that it sells "radio frequency communication equipment," including "devices . . . that are designed to deliberately jam or disrupt wireless communications," Comp. ¶ 7; and that several state and local agencies "contacted the company to explore the purchase" of such devices. Id. ¶ 14.

In reviewing a motion to dismiss for failure to state a claim, courts "accept well-pleaded facts and reasonable inferences drawn from those facts," Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003) (quotations omitted); Oladeinde v. City of Birmingham, 963 F.2d 1481, 1485 (11th Cir. 1992). However, "unsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." Marsh v. Butler County, 268 F.3d 1014, 1036 n. 16 (11th Cir. 2001); see also Gonzalez v. Reno, 325 F.3d at 1235. In reviewing a motion to dismiss for lack of subject-matter jurisdiction, courts can consider documents outside the pleadings, where the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's case. See Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997). The same point applies to a motion to dismiss for failure to state a claim, where the contents of the documents are not in dispute and are central to the allegations in the complaint. See In re Waterfront License Corp., 231 F.R.D. 693, 697-98 (S.D. Fla. 2005).

Here, in determining whether there is subject-matter jurisdiction over CellAntenna's claims, the Court should consider the FCC's letter of inquiry dated August 24, 2005; CellAntenna's response dated September 13, 2005; and the FCC's reply dated October 26, 2005. See In re Waterfront License Corp., 231 F.R.D. at 697-98; Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d at 1369. These contents of these documents are not in dispute, and these documents are central to the allegations in the Complaint. See Comp. ¶ 27 (discussing the FCC's

10

letter of inquiry); Casey Decl., Exhs. A-C.

The representations made by CellAntenna in response to the FCC's letter of inquiry establish that the FCC has not caused the company to suffer any legally cognizable injury. CellAntenna represented that the company "has not distributed" and "does not distribute" uncertified devices that intentionally cause radio frequency interference to "any local or state government," and markets such devices "only insofar as it has held a strict intention to distribute them . . . to the extent permitted by" the Communications Act and the FCC regulations.  Letter of September 13, 2005, at 5; Casey Decl., Exh. B.  CellAntenna also represented that the company responds to inquiries by stating that  radiofrequency devices "are exclusively intended for distribution to and use by the Federal Government." Id. at 3-4.

In light of these representations, CellAntenna cannot establish that it has suffered an "injury in fact," even assuming for purposes of this motion that the company received inquiries from state and local law enforcement agencies.  Because Cellantenna does not distribute radiofrequency devices to such agencies, and because the company so informs such agencies, there is no evidence that CellAntenna suffered lost sales as a result of any action taken by the FCC.  These representations also refute CellAntenna's claim that it "is in doubt as to its rights and liabilities" under the Communications Act and the FCC regulations with respect to the sale of such devices to sate and local agencies. Comp. ¶ 29.  To the contrary, CellAntenna has shown a clear understanding that the Communications Act authorized the FCC to promulgate regulations governing the interference potential of radiofrequency devices, and that the FCC acted in accordance with its statutory authority.  CellAntenna has also demonstrated its understanding that neither the Communications Act nor the FCC regulations exempt the sale of

11

devices to state and local government agencies. Id. ¶ 15.

CellAntenna also lacks any factual support for its conclusion that it "has a reasonable apprehension of enforcement action by the FCC." Id. ¶ 27. In the letter dated October 26, 2005, the FCC informed CellAntenna that, based upon the representations made by the company in response to the FCC's letter of inquiry, the FCC "was not planning to take further action regarding these matters" and had "closed this investigation." Id.; Casey Decl., Exh. C. Because the FCC closed its investigation without taking further action, any "apprehension" that CellAntenna may have regarding possible enforcement action by the FCC is speculative. In this context, plaintiff's unsupported conclusions are insufficient to meet its burden to establish jurisdiction over its claims. See Marsh v. Butler County, 268 F.3d at 1036 n. 16; Gonzalez v. Reno, 325 F.3d at 1235.

Furthermore, any claim of possible future harm is conjectural and hypothetical, given that CellAntenna informs state and local agencies that its radiofrequency devices are exclusively intended for distribution to the Federal Government. In light of that disclosure, even if state and local agencies were to inquire regarding the sale of radiofrequency devices, it is therefore unlikely that the agencies would purchase such devices from CellAntenna. Similarly, any "apprehension" expressed by CellAntenna that the FCC might undertake enforcement action against the company with respect to possible future sales of such devices to state and local agencies is entirely speculative, given CellAntenna's representation that it would limit future sales of such devices solely to federal agencies. A conclusory assertion of possible future harm does not constitute the type of "certainly impending" injury necessary to invoke the jurisdiction of the federal courts. See Whitmore, 495 U.S. at 158 ("Allegations of possible future injury do

12

not satisfy the requirements of Art. III.").

In sum, plaintiff's allegations of "possible future injury" fail to satisfy the requirements of Whitmore.  CellAntenna's "[u]nadorned speculation" regarding any uncertainty as to possible future sale or marketing of the device to state or local agencies in violation of the Communications Act and the FCC regulations, or as to any possible response of the FCC to such conduct, "will not suffice to invoke the judicial power." Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 44 (1976).

### C.     Plaintiff Lacks Standing to Assert Claims Based on Allegations as to the Rights of Third Parties

CellAntenna lacks standing to assert claims based upon its allegations as to the rights or interests of state and local government agencies.  In the Complaint, CellAntenna states its view that radiofrequency devices are a technology that "is needed by state and local law enforcement agencies to neutralize the killing potential of deadly remote controlled improvised explosive devices." Comp. ¶ 24.  Regardless of whether any state or local agency might subscribe to that view, CellAntenna lacks standing to assert claims on their behalf.  "In the ordinary course, a litigant must assert his or her own rights and legal interests, and cannot rest a claim to relief on the legal rights or interests of third parties." Powers v. Ohio, 499 U.S. 400, 410 (1991); see also Warth v. Seldin, 422 U.S. 490, 499 (1975). "The prohibition against third-party standing promotes the fundamental purpose of the standing requirement by ensuring that the courts hear only concrete disputes between interested litigants who will frame the issues properly." Harris v. Evans, 20 F.3d 1118, 1121 (11th Cir. 1994).  "The requirement of injury to the complaining party stems from Article III." Wolff v. Cash 4 Titles, 351 F.3d 1348, 1357 (11th Cir. 2003).

This rule against third-party standing applies unless: (a) plaintiff has suffered an "injury in fact," (b) plaintiff has a "close relation" to the third party, and (c) there is a "hindrance to the third party's ability to protect his or her own interests." Powers, 499 U.S. at 411; Harris, 20 F.3d at 1122. CellAntenna does not meet these three criteria. First, Cellantenna has not suffered an "injury-in-fact," as discussed in Part I above. Second, the company does not have a "close relation" with state and local government agencies, such that the company would be "fully, or very nearly, as effective a proponent of the right" as would the agencies. Harris, 20 F.3d at 1123 (citation omitted). Third, there is no "impediment to the ability," id. at 1124, of a state or local law enforcement agency to assert its own interests directly with the FCC, for example, by way of filing a request for rulemaking.

For all of these reasons, plaintiff is not suffering an "injury for which it is entitled to redress." Borg-Warner Protective Services Corp. v. EEOC, 245 F.3d 831, 834 (D.C. Cir. 2001). Because plaintiff lacks standing, the Court should dismiss the Complaint in its entirety.

## II.     THIS COURT LACKS SUBJECT-MATTER JURISDICTION OVER PLAINTIFF'S CHALLENGE TO THE FCC REGULATIONS

With respect to the sale of devices that are capable of interfering with radio communications, both the Communications Act and the FCC regulations exempt devices intended for use by the Federal Government, see 47 U.S.C. § 302a(c); 47 C.F.R. § 2.807(d), which devices are developed or procured under Federal Government standards designed to reduce interference with radio reception. 47 U.S.C. § 302a(c). And neither the Act nor the FCC regulations exempt devices intended for use by state or local governments. Id.; see also Comp. ¶¶ 11, 12. CellAntenna thus does not allege, and cannot establish, that the FCC regulations are "manifestly contrary" to the Communications Act. See Chevron, U.S.A., Inc. v. Natural

14

Resources Def. Council, Inc., 467 U.S. 837, 844 (1984).

To the extent that the Complaint may nonetheless be deemed to include a challenge either to the FCC regulations governing the sale of radiofrequency devices, or to the FCC's authority to enforce these regulations, exclusive judicial review of final FCC orders, such as final rulemaking decisions, lies in the Court of Appeals pursuant to the Hobbs Act, 28 U.S.C. § 2342(1), and 47 U.S.C. § 402(a).   See FCC v. ITT World Communications, 466 U.S. 463, 468 (1984); Bywater Neighborhood Ass'n v. Tricarico, 879 F.2d 165, 167 (5th Cir. 1989).  Under the special rules that apply to final orders of the FCC under the Hobbs Act, such orders may not be reviewed in a district court.  That is because "a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 77 (D.C. Cir. 1984).

The exclusive jurisdiction of the Court of Appeals under the Hobbs Act applies to claims challenging the FCC's regulations. See American Bird Conservancy v. FCC, 408 F. Supp. 2d 987, 991 (D. Haw. 2006) ("Where a party seeks to challenge regulations promulgated by the FCC, jurisdiction in district court is improper.").  In this context, it does not matter whether the claim is a challenge to the regulations on their face or as applied.  Id.  Where, as here, a statute commits review of agency action to the Court of Appeals, "any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to exclusive review of the Court of Appeals." Kaballer v. Busey, 999 F.2d 1417, 1420 (11th Cir. 1993)  (emphasis in original), citing Telecommunications Ctr. v. FCC, 750 F.2d at 75.

─────────────────────

[2] Under 28 U.S.C. § 2342(1), the Court of Appeals "has exclusive jurisdiction" to enjoin or determine the validity of all final orders of the FCC made reviewable by 47 U.S.C. § 402(a).

15

Thus, to the extent that plaintiff seeks to enjoin the FCC's enforcement of the regulations governing the sale of radiofrequency devices, see Comp. ¶ 31, this Court lacks jurisdiction over that claim.

## III.  PLAINTIFF FAILS TO STATE A CLAIM BECAUSE CONGRESS DID NOT IMPLIEDLY REPEAL THE COMMUNICATIONS ACT BY ENACTING THE HSA

Plaintiff asserts that Congress, by enacting the HSA, impliedly repealed the provisions of the Communications Act granting the FCC authority to regulate the sale of radiofrequency devices.  See Comp. ¶ 26.  As discussed below, even if plaintiff had standing to raise this claim and the Court had subject-matter jurisdiction over it, the Court should dismiss it because there is no irreconcilable conflict between these two statutes.

Given the lack of an explicit repeal, plaintiff must overcome "the cardinal rule . . . that repeals by implication are not favored." Traynor v. Turnage, 485 U.S. 535, 547 (1988) (internal quotation marks omitted); see also Crawford Fitting Co. v. Gibbons, Inc., 482 U.S. 437, 442 (1987); Posadas v. Nat'l City Bank of N.Y., 296 U.S. 497, 503 (1936).  "[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." Morton v. Mancari, 417 U.S. 535, 551 (1974); see also Traynor v. Turnage, 485 U.S. at 547-48; Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1018 (1984); Watt v. Alaska, 451 U.S. 259, 267 (1981).

An implied repeal will not be found unless there is a "positive repugnancy" between the statutes. J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, 534 U.S. 124, 143 (2001), citing Radzanower v. Touche Ross & Co., 426 U.S. 148, 155 (1976).  In other words, the doctrine of implied repeal does not apply unless the statutes "are irreconcilable." St. Martin Evangelical

16

Lutheran Church v. South Dakota, 451 U.S. 772, 788 (1981); Morton, 417 U.S. at 550.

There is no "positive repugnancy" between the Communications Act and the HSA, and the two statutes are not "irreconcilable." The HSA established the Department of Homeland Security and assigned to that agency a primary mission that includes preventing terrorist attacks with the United States and reducing the vulnerability of the United States to terrorism. 6 U.S.C. §§ 111(b)(1)(A) and (B); see also Dallas County, Alabama v. City Of Selma, __ F. Supp.2d __, 2006 WL 463869, *1 (S.D. Ala.) (Feb. 24, 2006 slip. op.). In order to achieve that mission, the HSA authorizes the Department of Homeland Security to work with other federal agencies and to coordinate certain activities with state and local government agencies. See , e.g., 6 U.S.C. §§ 162, 182, 361; see also Dallas County, *1, 3; Comp. ¶¶ 19.

None of the provisions of the HSA cited in the Complaint conflict with the provisions of the Communications Act at issue here. In evaluating plaintiff's claim of implied repeal, the Court should disregard plaintiff's unsupported conclusion to the contrary. See Marsh v. Butler County, 268 F.3d at 1036 n.16; Gonzalez v. Reno, 325 F.3d at 1235. The HSA does not alter the scope of the FCC's statutory authority to govern the sale of devices that are capable of interfering with radio communications. 47 U.S.C. § 302a(a). Nor does the HSA alter the scope of the statutory exemption for devices intended for use by the Federal Government, which devices are developed or procured under Federal Government standards designed to reduce interference with radio reception. Id. § 302a(c). The HSA does not prevent the FCC from regulating devices intended for sale to state or local agencies.

17

Plaintiff refers in general terms to "the legislative intent of the Congress, and the legitimate governmental interest and public policy considerations expressed in the HSA," Comp. ¶ 17, and to "the public policy statements and specific legislative directives which permeate the HSA." Id. ¶ 24. However, plaintiff does not allege that any specific provision of the HSA is in direct conflict with the relevant provisions of the Communications Act. Any "indefinite congressional expressions" alleged by plaintiff with respect to the authority of the Department of Homeland Security to coordinate certain activities with state and local government agencies "cannot negate plain statutory language and cannot work a repeal or amendment by implication." St. Martin Evangelical v. South Dakota, 451 U.S. at 788.

Here, as in Radzanower v. Touche Ross & Co., the provisions of the two statutes at issue "cannot be said to be in irreconcilable conflict in the sense that there is a positive repugnancy between them or that they cannot mutually coexist." 426 U.S. at 155. The Communications Act can readily coexist with the HSA. Plaintiff's position, by contrast, would rewrite provisions of the Communications Act to alter the scope of the FCC's authority to regulate the sale of radiofrequency devices, 47 U.S.C. § 302a, even though plaintiff has not cited to any provision of the HSA that would compel such a change. The mere fact that Congress authorizes the Department of Homeland Security to coordinate certain activities with state and local government agencies pursuant to the HSA does not mean that Congress specifically requires the FCC to exempt all devices intended for use by state and local government agencies from the FCC regulations governing the sale of radiofrequency devices under the Communications Act, particularly where plaintiff has not established that such devices were developed under Federal Government standards designed to reduce interference with radio reception. When Congress

enacted the HSA, it must be presumed to have known of the Communications Act and to have

passed the new laws in view of the provisions of the legislation already enacted. See Traynor v.

Turnage, 485 U.S. at 546.

Many courts have harmonized statutes by applying the "fundamental" canon that "a

general statutory provision may not be used to nullify or to trump a specific provision,

irrespective of the priority of enactment." Sacramento Metro. Air Quality Mgmt. Dist. v. United

States, 215 F.3d 1005, 1013, 1014 (9th Cir. 2000) (holding that general federal removal statute

does not override provision of Clean Air Act that implicitly prohibits the removal of actions by

federal facility charged with violation of state and local air quality laws; statutes can be

harmonized by concluding that Congress did not intend for federal government's general right of

removal to apply to actions brought by state and local governments pursuant to their own air

quality laws); see also Rucker v. Davis, 203 F.3d 627, 643 (9th Cir. 2000) (holding that a statute

requiring the terms of a lease to be reasonable does not trump a statute authorizing the eviction of

innocent tenants whose guests secretly possess illegal drugs).  This is because:

> [W]hen the mind of the legislator has been turned to the details of a subject, and
> he has acted upon it, a subsequent statute in general terms, or treating the subject
> in a general manner, and not expressly contradicting the original act, shall not be
> considered as intended to affect the more particular or positive previous
> provisions, unless it is absolutely necessary to give the latter act such a
> construction, in order that its words shall have any meaning at all.

Sacramento Air Quality Mgmt. Dist., 215 F.3d at 1013 (quoting Radzanower v. Touche Ross &

Co., 426 U.S. at 153 (quotations omitted)).

Because both the HSA and the Communications Act can be given full effect, the general may not be used to trump the specific. Sacramento Air Quality Mgmt. Dist., 215 F.3d at 1013; see also Morton, 417 U.S. at 551 (holding that the Equal Employment Opportunities Act of 1972, a general anti-discrimination statute, could coexist harmoniously with a statute granting Indian preferences in employment; Muller v. Lujan, 928 F.2d 207, 211-212 (6th Cir. 1991) (holding that the Federal Employees Salary Act of 1965 was capable of coexistence with the Age Discrimination in Employment Act); Smith v. Christian, 763 F.2d 1322, 1325 (11th Cir. 1985) (relying on Morton to hold that the specific statutory authority granted to the Secretary of the Navy to establish physical qualifications for commissioned officers of the Naval Reserve took "precedence over the general guidelines of the Rehabilitation Act").

For these reasons, even if plaintiff had standing to assert this claim and the Court had subject-matter jurisdiction over it, plaintiff fails to state a claim of implied repeal by the HSA.

## IV.   PLAINTIFF FAILS TO STATE A CONSTITUTIONAL CLAIM

Plaintiff asserts that the provisions of the Communications Act governing the sale of radiofrequnecy devices violate, on their face and as applied, the substantive due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution. Comp. ¶ 25. For the reasons discussed below, even if plaintiff had standing to assert such claims and the Court had subject-matter jurisdiction over them, these constitutional challenges lack merit. Equal protection under the Constitution directs that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Where, as here, the provisions at issue do not target a protected class and do not implicate a fundamental right, courts apply the "highly deferential" rational-basis test to substantive due process claims,

Schwarz v. Kogan, 132 F.3d 1387, 1390 (11th Cir. 1998), and to equal protection claims. Joel v. City of Orlando, 232 F.3d 1353, 1357 (11th Cir. 2000). Under the rational-basis test, the challenged statute is entitled to a "strong presumption of validity," id., 232 F.3d at 1358, citing FCC v. Beach Communications, Inc., 508 U.S. 307, 314-15 (1993), so much so that a court's "review of enactments under the rational basis standard must be a paradigm of judicial restraint." Id.

The Communications Act authorizes the FCC to promulgate regulations governing the interference potential of devices that are capable of interfering with radio communications, 47 U.S.C. § 302a(a), while exempting devices intended for use by the Federal Government, which devices are developed or procured under Federal Government standards designed to reduce interference with radio reception. Id. § 302a(c). Plaintiff concedes that the devices at issue "cause radio frequency interference" and "are designed to deliberately jam or disrupt wireless communications." Comp. ¶ 7. Plaintiff does not allege that such jamming devices were developed under Federal Government standards designed to reduce interference with radio reception. See 47 U.S.C. § 302a(c). And plaintiff does not allege that it was subject to disparate treatment by the FCC.

Plaintiff's constitutional challenge to those statutory provisions would be subject to the minimum standard of rational basis review, under which the distinction must be rationally related to a legitimate governmental purpose. See Board of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 366-67 (2001); City of Cleburne, 473 U.S. at 440-46. Under rational-basis review, the legislature that creates a classification "need not actually articulate at any time the purpose or rationale supporting its classification. Instead, a classification must be upheld

against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Heller v. Doe , 509 U.S. 312, 320 (1993) (internal quotation marks and citations omitted). See also Anderson v. Winter, 631 F.2d 1238, 1240-41 (5th Cir. 1980). "[T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it . . . ." Heller , 509 U.S. at 320; see also Garrett, 531 U.S. at 367.

These provisions of the Communications Act are rationally related to the governmental purpose of reducing the risk of harm that could result from the sale of devices that are capable of interfering with radio communications, particularly for devices that were not developed under Federal Government standards designed to reduce interference with radio reception. Thus, even if plaintiff had standing to assert these constitutional challenges and the Court had subject-matter jurisdiction over them, the Court should dismiss such claims.

## V.   PLAINTIFF IS NOT ENTITLED TO AN INJUNCTION

### A.   Because The Court Lacks Subject-Matter Jurisdiction Over the Complaint, the Requests for Preliminary and Permanent Injunctions Must Be Denied

In Count II of the Complaint, plaintiff seeks preliminary and permanent injunctions barring the FCC from enforcing the Communications Act and the FCC regulations with respect to the sale of radiofrequency devices intended for use by state and local agencies.  Comp. ¶ 31.

However, as discussed in Part I above, plaintiff lacks standing to pursue its challenge to these provisions, and the Court lacks subject-matter over that claim.  As a result, plaintiff's requests for preliminary and permanent injunctions must be denied.  In that regard, it is firmly established that "[w]ithout jurisdiction the court cannot proceed at all in any cause." Steel Co. v. Citizens for a Better Env't, 523 U.S. at 94 (quoting Ex Parte McCardle, 7 Wall. 506, 514 (1868)).

22

When jurisdiction "ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Steel Co., 523 U.S. at 94.

For this reason, the Court must dismiss Count II and deny plaintiff's requests for preliminary and permanent injunctions.

### B.   Even If The Court Had Subject-Matter Jurisdiction, Plaintiff Has Failed To Establish Any Basis For Granting A Preliminary Injunction

In the Eleventh Circuit, "a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion" as to each of four factors. Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations and internal quotation marks omitted); see also West-Point Pepperell, Inc. v. Donovan, 689 F.2d 950, 956 (11th Cir. 1982). The four factors are whether: (1) the movant has a substantial likelihood of success on the merits, (2) there is a substantial threat of irreparable injury to the movant if the preliminary injunction is not granted, (3) the threatened injury to the movant outweighs the harm that the injunction may cause the opposing party, and (4) granting the injunction is not adverse to the public interest. See Frio Ice, S.A. v. Sunfruit, Inc., 918 F.2d 154, 159 (11th Cir. 1990); West-Point Pepperell, Inc. v. Donovan, 689 F.2d at 956. The standards for a permanent injunction are essentially the same, except that the movant must establish actual success rather than a likelihood of success on the merits. See, e.g., Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987). The application of these factors weighs heavily against the issuance of injunctive relief to plaintiff. Accordingly, the Court should deny plaintiff's requests for preliminary and permanent injunctions.

23

### 1.   Plaintiff has failed to establish irreparable harm

"A showing of irreparable harm is 'the sine qua non of injunctive relief.'" <u>Siegel v.</u>

<u>Lepore</u>, 234 F.3d at 1176 (citations omitted). "[T]he absence of a substantial likelihood of

irreparable injury would, standing alone, make preliminary injunctive relief improper." <u>Id.</u>

(citations omitted).  In seeking prospective equitable relief, the plaintiff must show that he "has

sustained or is immediately in danger of sustaining some direct injury" as the result of the

challenged official conduct, and the injury or threat of injury must be both "real and immediate,"

not "conjectural" or "hypothetical." <u>City of Los Angeles v. Lyons</u>, 461 U.S. at 101; <u>see</u> <u>also</u>

<u>Siegel v. Lepore</u>, 234 F.3d at 1176 (in order to qualify as irreparable, harm "must be neither

remote nor speculative, but actual and imminent") (citation omitted).

Here, plaintiff's allegations of harm are merely conjectural or hypothetical.  The alleged

harm is contingent on future events that are not likely to occur.  Plaintiff alleges that, "to the

extent that" the Communications Act and the FCC regulations prohibit plaintiff "from selling

cellular jamming devices to state and local governments," the FCC's enforcement of these

restrictions will cause plaintiff "irreparable harm and injury for which it has no adequate remedy

at law." Comp. ¶ 31.  But, as discussed in Part I above, contrary to such conclusory assertions,

plaintiff has represented that it has not sold and does not intend to sell the devices to state and

local agencies, and that it so informs such agencies.  Plaintiff thus has not alleged facts to support

a claim that future sales are imminent.

Plaintiff lacks standing to assert a claim of irreparable harm based upon its allegations

regarding third parties.  Plaintiff alleges that "the responsible use of cellular jamming devices is

an effective tool in the fight against terrorism," Comp. ¶ 14, and that the lack of a statutory

exemption allowing the sale of such devices to state and local law enforcement agencies creates an "ominous specter of injury to the Plaintiff, and indeed to the general public." Id. ¶ 32. However, as discussed in Part I above, plaintiff "cannot rest a claim to relief on the legal rights or interests of third parties." Powers v. Ohio, 499 U.S. at 410; see also Harris v. Evans, 20 F.3d at 1121.

One factor to be considered in reviewing a claim of irreparable harm is delay of the movant in seeking injunctive relief. Tom Doherty Assoc., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 39 (2d Cir. 1995). Here, plaintiff waited until April of 2006, more than seven months after it received the FCC"s letter of inquiry, before filing suit. Such delay "indicates that a suit . . . is more about gaining an advantage (either a commercial or litigation advantage) than protecting a party from irreparable harm." Pippin v. Playboy Entm't Group, Inc., 2003 WL 21981900, at *2 (M.D. Fla. 2003).

For these reasons, plaintiff fails to establish a substantial likelihood of irreparable harm, and the motions for preliminary and permanent injunctions must be denied on that basis. See Siegel v. Lepore, 234 F.3d at 1176; Snook v. Georgia Bank, 909 F.2d 480, 486 (11th Cir. 1990).

## 2.    **The balance of harms favors the Government**

Plaintiff has failed to satisfy its burden as to the balance of harms here. Plaintiff has not alleged any harm that would outweigh the FCC's significant interest in exercising the authority granted by Congress to regulate the sale of radiofrequency devices, such as the jamming devices that plaintiff might offer for sale. That governmental interest clearly outweighs plaintiff's private, commercial interest in seeking to generate additional sales of jamming devices.

3.      **Plaintiff has no likelihood of success on the merits**

For the reasons set forth in Parts I through IV above, plaintiff has failed to establish a

likelihood of success on the merits of its claims. Plaintiff's lack of standing and the absence of

subject-matter jurisdiction, as discussed in Parts I and II above, preclude success on the merits.

With respect to these claims, "a party cannot prevail on the merits of a suit that it does not (yet)

have the right to bring." NationsBank Corp. v. Herman, 174 F.3d 424, 427(4ᵗʰ Cir. 1999)

(preliminary injunction was improper because bank was required to exhaust administrative

remedies before bringing suit against agency). In addition, even if plaintiff had standing to assert

such claims and the court had subject-matter jurisdiction over them, plaintiff fails to establish a

likelihood of success on the merits, for the reasons discussed in Parts III and IV above. Even in

cases where a plaintiff could establish irreparable harm, the failure of a plaintiff to establish a

substantial likelihood of success on the merits is dispositive. See Nnadi v. Richter, 976 F.2d 682,

690 (11ᵗʰ Cir. 1992).

4.      **The public interest supports denial of a preliminary injunction**

The public interest also supports the denial of plaintiff's motion for injunctions. Plaintiff

lacks standing to assert its claims, due to the absence of an "injury in fact," as discussed in Part I

above. There is a substantial public interest, which underlies the prudential aspects of the ripeness

doctrine, "to prevent the courts, through avoidance of premature adjudication, from entangling

themselves in abstract disagreements over administrative policies, and also to protect the agencies

from judicial interference until an administrative decision has been formalized and its effects felt

in a concrete way by the challenging parties." National Park Hospitality Ass'n v. Department of

the Interior, 538 U.S. 803, 807-808 (2003) (quoting Abbott Laboratories v. Gardner, 387 U.S.

136, 148-149 (1967)).

The significant harm that would be caused by disrupting the FCC's enforcement authorities outweighs "a remote and speculative possibility" of harm to plaintiff at some future date. See Gifford-Hill & Co. v. Federal Trade Comm'n, 389 F. Supp. 167, 176-77 (D.D.C. 1974). The public interest would thus be served by denying plaintiff's requests for preliminary and permanent injunctions. As one court has stated, "consideration of the public interest is particularly crucial in a suit seeking to enjoin governmental action being carried out pursuant to a statute." Newdow v. Bush, 355 F. Supp.2d 265, 293 (D.D.C. 2005) (citations omitted).

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss the Complaint in its entirety and deny plaintiff's requests for preliminary and permanent injunctions.

DATED: June 30, 2006

<div style="margin-left:40%">

Respectfully Submitted:

R. ALEXANDER ACOSTA
United States Attorney

PETER D. KEISLER
Assistant Attorney General

THEODORE C. HIRT
Assistant Branch Director

By: _Peter Wechsler AUSA 013c057/kn_

PETER T. WECHSLER (MA Bar)
Trial Attorney
United States Department of Justice
Civil Division
Email: peter.wechsler@usdoj.gov
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel.: (202) 514-2705

</div>

27

Fax: (202) 616-8470
Attorneys for Defendants

<u>CERTIFICATE OF SERVICE</u>
CASE NO: 06-CV-60430-CIV-HUCK

I HEREBY CERTIFY that on this 30th of June, 2006, a true and correct copy of the

foregoing was mailed postage prepaid to counsel listed on the attached service list.

Marlene Rodriguez (0120057)
Assistant United States Attorney, SDFL

<u>SERVICE LIST</u>

CASE NO: 06-CV-60430-CIV-HUCK

Jeffrey A. Sarrow, P.A.
Jsparrowpa@aol.com
300 South Pine Island Road, Suite 304,
Plantation, FL 33324
Telephone: (954) 475-3188
Facsimile: (954) 474-4416
Attorney for Plaintiff, CellAntenna Corp.

Peter T. Wechsler (MA Bar)
Trial Attorney
United States Department of Justice
Civil Division
Email: peter.wechsler@usdoj.gov
Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel.: (202) 514-2705
Fax: (202) 616-8470
Attorney for Defendants

## DECLARATION OF   Joseph P. Casey

I, Joseph P. Casey, hereby declare and state as follows:

I have been employed by the Federal Communications Commission ("FCC") since June 27, 1971 and have served as the Chief, Spectrum Enforcement Division of its Enforcement Bureau since November 7, 1999.  In that capacity, I am responsible for and oversee all of the activities of the Spectrum Enforcement Division.

This declaration is based upon my personal knowledge and my review of the FCC's official files.

Exhibit A hereto is a true and accurate copy of a letter dated August 24, 2005, from Kathryn S. Berthot, Deputy Chief of the Spectrum Enforcement Division of the FCC's Enforcement Bureau, to CellAntenna Corporation ("CellAntenna").

Exhibit B hereto is a true and accurate copy of a letter dated September 13, 2005, from CellAntenna's Counsel Ronald G. London to Neal McNeil of the FCC's Spectrum Enforcement Division, enclosing the Declaration of Howard Melamed, president and CEO of CellAntenna.

Exhibit C hereto is a true and accurate copy of a letter dated October 26, 2005, from Joseph Casey, Chief of the FCC's Spectrum Enforcement Division, to Howard Melamed.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 29, 2006, in the District of Columbia.



**FEDERAL COMMUNICATIONS COMMISSION**
Enforcement Bureau
Spectrum Enforcement Division
445 12th Street, S.W.
Washington, D.C. 20554

August 24. 2005

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**AND FACSIMILE**

CellAntenna Corporation
9625 West Sample Road
Coral Springs. FL 33065

Re:    **File No. EB-05-SE-176**

Dear Sir or Madame:

The Enforcement Bureau is investigating a complaint alleging that CellAntenna is marketing to law enforcement and other government agencies in the United States uncertified devices that intentionally cause radio frequency interference (cell phone jammers) in violation of Section 302(b) of the Communications Act of 1934, as amended, ("Act"). 47 U.S.C. § 302a(b), and Section 2.803 of the Commission's Rules ("Rules"). 47 C.F.R. § 2.803. Accordingly. we direct CellAntenna, pursuant to Sections 4(i), 4(j), and 403 of the Act, 47 U.S.C. §§ 154(i), 154(j), and 403, to provide the information and documents specified herein. within 20 calendar days from the date of this letter.

Inquiries:  Information and Documents to be Provided:

(1) State the date on which CellAntenna began marketing (including sale. offer for sale or advertising) the cell phone jammers with model numbers CJAM100, CJAM500, and CJAM1000; the total number of units of each device distributed in the United States to date; and list any retailers/distributors, private individuals, and local and state governments to whom the units were distributed.

(2) If CellAntenna  manufactures the CJAM100, CJAM500, and CJAM1000, state the date on which CellAntenna began manufacturing each device, the location where the devices are manufactured, and the total number of units of each device manufactured for sale in the United States to date.  In addition. state whether CellAntenna continues to manufacture these devices listed and. if not, state the date on which

CellAntenna discontinued the manufacture of these devices. If CellAntenna does not manufacture the devices, provide the name and address of the manufacturer and explain CellAntenna 's relationship, if any, with the manufacturer.

(3) If CellAntenna imports any of the CJAM100, CJAM500, and CJAM1000 cell phone jammer models into the United States, state the date on which CellAntenna began importing these devices, all dates on which the devices were imported, and the total number of units of each device imported for sale in the United States to date. Further, state whether CellAntenna continues to import any of the CJAM100, CJAM500, and CJAM1000 cell phone jammer models and, if not, state the date on which CellAntenna discontinued importation of these devices.

(4) Provide copies of any marketing materials, including advertisements, catalogs, list of web sites used, offers for sale and promotional materials of any kind and order forms, that CellAntenna has distributed to the public or to retailers, distributors or dealers for the CJAM100, CJAM500, and CJAM1000 cell phone jammers.

(5) Provide the model numbers, and operational descriptions, of any other radio frequency jammers that you currently market, or have marketed in the past to any United States-based person or entity other than the Federal Government, and list any retailers or wholesalers, private individuals, and local and state governments to whom the units were distributed.

(6) Pursuant to Section 15.201(b) of the Rules, 47 C.F.R. § 15.201(b), all intentional radiators must be authorized in accordance with the Commission's certification procedures prior to the initiation of marketing in the United States. State whether the CJAM100, CJAM500, and CJAM1000 cell phone jammers were authorized in accordance with the Commission's certification procedures. If so, provide the FCC ID number for each. If not, state the basis for your authority to market these devices in the United States.

(7) Section 302(c) of the Act, 47 U.S.C. § 302a(c), and Section 2.807 of the Rules, 47 C.F.R. § 2.807(d), exempt radio frequency devices intended for use by the Federal Government from the Commission's equipment authorization requirements; however, such exemption does not extend to local and state governments. Explain under what authorization you believe you can market uncertified radio transmitting equipment (jammers) to local and state governments.

<u>Definitions</u>

For purposes of this letter, the following definitions apply:

"Any" shall be construed to include the word "all," and the word "all" shall be construed to include the word "any." Additionally, the word "or" shall be construed to include the word "and," and the word "and" shall be construed to include the word "or."

The word "each" shall be construed to include the word "every," and the word "every" shall be construed to include the word "each."

"Document" shall mean the complete original (or in lieu thereof, exact copies of the original) and any non-identical copy (whether different from the original because of notations on the copy or otherwise), regardless of origin or location, of any taped, recorded, transcribed, written, typed, printed, filmed, punched, computer-stored, or graphic matter of every type and description, however and by whomever prepared, produced, disseminated, or made, including but not limited to any [broadcast, radio program,] advertisement, book, pamphlet, periodical, contract, correspondence, letter, facsimile, e-mail, file, invoice, memorandum, note, telegram, report, record, handwritten note, working paper, routing slip, chart, graph, photograph, paper, index, map, tabulation, manual, guide, outline, script, abstract, history, calendar, diary, agenda, minute, marketing plan, research paper, preliminary drafts, or versions of all of the above, and computer material (print-outs, cards, magnetic or electronic tapes, disks and such codes or instructions as will transform such computer materials into easily understandable form).

Instructions

If CellAntenna requests that any information or documents, as defined herein, responsive to this letter be treated in a confidential manner, it shall submit, along with all responsive information and documents, as defined herein, a statement in accordance with Section 0.459 of the Commission's rules. 47 C.F.R. § 0.459. Requests for confidential treatment must comply with the requirements of Section 0.459, including the standards of specificity mandated by Section 0.459(b). Accordingly, "blanket" requests for confidentiality of a large set of documents are unacceptable. Pursuant with Section 0.459(c), the Bureau will not consider requests that do not comply with the requirements of Section 0.459.

If CellAntenna withholds any information or documents under claim of privilege, it shall submit, together with any claim of privilege, a schedule of the items withheld that states, individually as to each such item, the numbered inquiry to which each item responds and the type, title, specific subject matter, and date of the item; the names, addresses, positions, and organizations of all authors and recipients of the item; and the specific ground(s) for claiming that the item is privileged.

Each requested document not subject to a claim of privilege shall be submitted in its entirety, even if only a portion of that document is responsive to an inquiry made herein. This means that the document shall not be edited, cut, or expunged, and shall include all appendices, tables, or other attachments, and all other documents referred to in the document or attachments. All written materials necessary to understand any document responsive to these inquiries must also be submitted.

If a document responsive to any inquiry made herein existed but is no longer available, or if CellAntenna is unable for any reason to produce a document responsive to

3

any inquiry, identify each such document by author, recipient, date. title, and specific subject matter, and explain fully why the document is no longer available or why CellAntenna is otherwise unable to produce it.

With respect only to documents responsive to the specific inquiries made herein and any other documents relevant to those inquiries. CellAntenna is directed to retain the originals of those documents for twelve (12) months from the date of this letter unless (1) CellAntenna is directed or informed by the Enforcement Bureau in writing to retain such documents for some shorter or longer period of time or (2) the Enforcement Bureau and/or the Commission releases any item on the subject of this investigation, including, but not limited to, a Notice of Apparent Liability for Forfeiture or an order disposing of the issues in the investigation, in which case, CellAntenna must retain all such documents until the matter has been finally concluded by payment of any monetary penalty, satisfaction of *all* conditions, expiration of all possible appeals, conclusion of any collection action brought by the United States Department of Justice or execution and implementation of a final settlement with the Commission or the Enforcement Bureau.

The specific inquiries made herein are continuing in nature. CellAntenna is required to produce in the future any and all documents and information that are responsive to the inquiries made herein but not initially produced at the time, date and place specified herein. In this regard, CellAntenna must supplement its responses (a) if CellAntenna learns that, in some material respect. the documents and information initially disclosed were incomplete or incorrect or (b) if additional responsive documents or information are acquired by or become known to CellAntenna after the initial production. The requirement to update the record will continue for twenty-four (24) months from the date of this letter unless (1) CellAntenna is directed or informed by the Enforcement Bureau in writing that CellAntenna obligation to update the record will continue for some shorter or longer period of time or (2) the Enforcement Bureau and/or the Commission releases an item on the subject of this investigation, including. but not limited to, a Notice of Apparent Liability for Forfeiture or an order disposing of the issues in the investigation, in which case the obligation to update the record will continue until the release of such item.

For each document or statement submitted in response to the inquiries below, indicate, by number, to which inquiry it is responsive and identify the person(s) from whose files the document was retrieved. If any document is not dated, state the date on which it was prepared. If any document does not identify its author(s) or recipient(s). state, if known, the name(s) of the author(s) or recipient(s). CellAntenna must identify with reasonable specificity all documents provided in response to these inquiries.

We direct CellAntenna to support its responses with an affidavit or declaration under penalty of perjury, signed and dated by an authorized officer of CellAntenna with personal knowledge of the representations provided in CellAntenna's response, verifying the truth and accuracy of the information therein and that all of the documents and information requested by this letter which are in CellAntenna's possession, custody, control or knowledge have been produced. If multiple CellAntenna employees contribute

4

to the response, in addition to such general affidavit or declaration of the authorized officer of CellAntenna noted above, provide separate affidavits or declarations of each such individual that identify clearly to which responses the affiant or declarant is attesting. All such declarations provided should comply with section 1.16 of the Commission's rules. 47 C.F.R. § 1.16, and be substantially in the form set forth therein. To knowingly and willfully make any false statement or conceal any material fact in reply to this inquiry is punishable by fine or imprisonment. *See* 18 U.S.C. § 1001; *see also* 47 C.F.R. § 1.17.

<u>Reply</u>

CellAntenna should direct its response to the attention of Neal McNeil, Spectrum Enforcement Division, Enforcement Bureau, Federal Communications Commission, 445 12th Street, S.W., Room 7-A802, Washington, DC, 20554, and must submit its response via first class mail and facsimile to 202-418-7290.

Direct any questions regarding this investigation to Neal McNeil at 202-418-2408.

Sincerely,

Kathryn S. Berthot
Deputy Chief, Spectrum Enforcement Division
Enforcement Bureau

5

MAY.17.2005   9:16AM   FCC OGC                                        NO.990   P.2

 

# Davis Wright Tremaine LLP

ANCHORAGE    BELLEVUE    LOS ANGELES    NEW YORK    PORTLAND    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

RONALD G. LONDON                    SUITE 450                    TEL (202) 508-6600
DIRECT (202) 508-6635               1500 K STREET NW.            FAX (202) 508-6699
ronnielondon@dwt.com                WASHINGTON, D.C. 20005-1272   www.dwt.com

September 13, 2005

**Via First Class Mail and**
**Facsimile (202-418-7290)**

Mr. Neal McNeil
Spectrum Enforcement Division
Enforcement Bureau
Federal Communications Commission
445 12th Street, S.W. – Room 7-A802
Washington, DC 20554

Re:     **Response to Letter of Inquiry**
        **FCC File No. EB-05-SE-176**

Dear Mr. McNeil:

CellAntenna Corporation ("CellAntenna"), by counsel, hereby responds to the August 24, 2005, Letter of Inquiry ("LOI") from your office regarding a complaint that alleges CellAntenna is marketing to law enforcement and other government agencies in the United States uncertified devices that intentionally cause radio frequency interference, specifically, cell phone jammers with model numbers CJAM100, CJAM500 and CJAM1000 (the "Devices"). As explained in the responses to the LOI's questions below, CellAntenna does not manufacture the Devices, or any other "jammer" equipment, nor does it provide the Devices or any other such equipment to retailers or wholesalers, private individuals, or local or state governments in the United States. Rather, CellAntenna sells the Devices in the United States only insofar as they are intended for use by the Government of the United States, *i.e.*, the Federal Government.

1.     **State the date on which CellAntenna began marketing (including sale, offer for sale or advertising) the cell phone jammers with model numbers CJAM100, CJAM500, and CJAM1000; the total number of units of each device distributed in the United States to date; and list any retailers/distributors, private individuals, and local and state governments to whom the units were distributed.**



Mr. Neal McNeil
September 13, 2005
Page 2 of 6

CellAntenna has never distributed the Devices to any retailers/distributors, private individuals, or local or state governments within the United States. It began marketing the Devices on approximately August 20, 2003. To date CellAntenna has distributed only two (2) units of the Devices in the United States, with delivery in each case to:

> US Secret Service/FCD/CID
> 95 H Street NW
> Suite 5300
> Washington DC 20223

2.    If CellAntenna manufactures the CJAM100, CJAM500, and CJAM1000, state the date on which CellAntenna began manufacturing each device, the location where the devices are manufactured, and the total number of units of each device manufactured for sale in the United States to date. In addition, state whether CellAntenna continues to manufacture these devices listed and, if not, state the date on which CellAntenna discontinued the manufacture of these devices. If CellAntenna does not manufacture the devices, provide the name and address of the manufacturer and explain CellAntenna's relationship, if any, with the manufacturer.

CellAntenna does not manufacture and has never manufactured the Devices. The Devices are manufactured by the following two companies:

> Siangsiu Industrial Corp.              Empower RF Systems
> 11F-1, No. 29, Sec. 3 Roosevelt Rd.    316 W Florence Ave
> Taipei, Taiwan 106                     Inglewood, CA 90301

CellAntenna's relationship with the above manufacturers is solely that of a customer in business-to-business transactions.

3.    If CellAntenna imports any of the CJAM100, CJAM500, and CJAM1000 cell phone jammer models into the United States, state the date on which CellAntenna began importing these devices, all dates on which the devices were imported, and the total number of each device imported for sale into the United States. Further, state whether CellAntenna continues to import any of the CJAM100, CJAM500, and CJAM1000 cell phone jammer models and, if not, state the date on which CellAntenna discontinued importation of these devices.

CellAntenna received all the Devices it obtained from Siangsiu Industrial, numbering thirty-four (34) units in all, in a single order with but one delivery in a transaction that was completed September 21, 2004, and culminated in a shipment received approximately November 1, 2004. CellAntenna received one unit from Empower RF Systems through an order that was completed April 2, 2004, and culminated in a shipment received approximately April 9, 2004 (CellAntenna

Mr. Neal McNeil
September 13, 2005
Page 3 of 6



has not sold this unit to date). CellAntenna has no outstanding orders to obtain additional units of the Devices.

4.     Provide copies of any marketing materials, including advertisements, catalogs, list of websites used, offers for sale and promotional materials of any kind and order forms, that CellAntenna has distributed to the public or to retailers, distributors or dealers for the CJAM100, CJAM500, and CJAM1000 cell phone jammers.

*Advertisements, catalogs, promotional materials, offers for sale, order forms*:  CellAntenna has not distributed any advertisements, catalogs, promotional materials, offers for sale, or order forms for the Devices in the United States to the public or to retailers, distributors, or dealers.

*Websites*:  CellAntenna currently has a website that includes pages with information about the Devices, which insofar as it is viewed in the United States is intended for communication in furtherance of making the Devices available exclusively for distribution to and use by the Federal Government. CellAntenna has operated a similar website in the past, though it became obsolete and no longer used some time ago. Information on these websites follows.

*Current website*:  The URLs for the pages at CellAntenna's website related to the Devices are:

http://www.cellantenna.com
http://www.cellantenna.com/CJAM/cjam.htm
http://www.cellantenna.com/CJAM/cjam_100.htm
http://www.cellantenna.com//CJAM/cjam_500.htm
http://www.cellantenna.com//CJAM/cjam_1000.htm
http://www.cellantenna.com//CJAM/cjamint.htm

CellAntenna also uses the URL http://www.cjam.com, which redirects web browsers to the main webpage http://www.cellantenna.com/CJAM/cjam.htm (listed above).  From the time of its inception until receipt of the LOI, this page contained a special notification alerting that visitors should "*NOTE: Cellular Jamming for North American Government Organizations or for Export Only*. The CJAM product line is intended to be used for law enforcement and other government agencies. It is illegal for the public to operate cellular jamming devices in the United States. For all other countries please consult with the authority having jurisdiction." Upon receipt of the LOI, the notification was clarified to state that visitors should "***NOTE:*** *THIS PRODUCT IS BEING SOLD AND MARKETED ONLY TO UNITED STATES GOVERNMENT AND ITS AGENCIES, OR FOR EXPORT TO FOREIGN GOVERNMENT ORGANIZATIONS. CELLANTENNA DOES SALE OR MARKET ANY OF ITS JAMMING PRODUCTS FOR USE BY PRIVATE COMPANIES OR INDIVIDUALS.*" The clarified disclaimer also was added shortly thereafter to the product-specific pages listed above for each of the Devices. Printouts of the webpages listed above are enclosed at Appendix A.

If CellAntenna receives any inquiry for the Devices from within the United States from sources other than the Federal Government, CellAntenna responds that in the United States the Devices



Mr. Neal McNeil
September 13, 2005
Page 4 of 6

are exclusively intended for distribution to and use by the Federal Government, and cannot be purchased by anyone else in this country.

*Obsolete website*:  In researching its records to respond to the LOI, CellAntenna discovered that the following URLs, which are related to a website CellAntenna once operated that included pages with information about precursors to the Devices, were still operational though they have not been used for some time and are now obsolete:

http://www.celljam.com
http://www.celljam.com/search.htm
http://www.celljam.com/products.htm
http://www.celljam.com/scenarios.htm
http://www.celljam.com/technology.htm

These webpages were never significantly promoted, did not result in any inquiries regarding the Devices, and had fallen into disuse, as evidenced by the "last modified date" of "09/03/03" shown at the webpages.  Significantly, CellAntenna did not have any inventory of the Devices (or their precursors) at the time this website was active, and in fact, as indicated in Response No. 3 above, CellAntenna did not receive any of the Devices into inventory until more than 6 months after the last date the obsolete website was updated (and even that was for only one unit – it did not receive the remainder of its inventory of the Devices until over a *full year* after the obsolete website was last updated).  More importantly, as with the current website, the homepage for the obsolete site always has contained a special notification alerting visitors that "products that we sell are not for public use. They are sold only to State and Federal Government agencies which operate exempt from FCC Regulations." It should be noted that the reference to "State Government" agencies and the inclusion of state entities in the "Contact Information" statement that visitors who "represent State and Federal departments [should] please contact us," were based on informal guidance provided at the time by an FCC field agent in the Miami, Florida, Resident Agent Office, and in any event indicated that sales were permitted only where exemptions from FCC rules applied.  In preparing its response to the LOI, CellAntenna ensured that the obsolete "celljam.com" webpages are no longer accessible and that the URL redirects browsers to the main www.cellantenna.com/CJAM/cjam.htm webpage (listed above). Printouts of the obsolete pages are enclosed at Appendix B.

*Other Marketing Materials*:  In addition to its Internet presence related to the Devices as described above, CellAntenna has distributed the marketing materials enclosed at Appendix C with respect to the Devices.  However, these materials were distributed in the United States only at law enforcement or wireless industry functions where employees of the Federal Government were present.  In this regard, CellAntenna participates at conventions and similar assemblies involving the wireless industry and/or law enforcement officers, at which it sometimes operates a booth or otherwise provides information about the Devices.  However, such participation is limited only to conventions or similar assemblies at which employees of the Federal Government are in attendance.  To the extent that during these appearances CellAntenna has posted at a booth

Mr. Neal McNeil
September 13, 2005
Page 5 of 6



information about the Devices other than the materials included at Appendix C, a copy of the additional material is enclosed at Appendix D.

5.     Provide the model numbers, and operational descriptions, of any other radio frequency jammers that you currently market, or have marketed in the past to any United States-based person or entity other than the Federal Government, and list any retailers or wholesalers, private individuals, and local and state governments to whom the units were distributed.

As noted, CellAntenna has not distributed the Devices or any other "jammers" in the United States to any retailer or wholesaler, private individual, or local or state government. Other than precursors to the Devices listed at the little-used obsolete website described above (as to which CellAntenna never made sales or even had any inventory), CellAntenna has not marketed radio frequency jammers other than the Devices to any United States-based or other person or entity.

6.     Pursuant to Section 15.201(b) of the Rules, 47 C.F.R. § 15.201(b), all intentional radiators must be authorized in conjunction with the Commission's certification procedures prior to the initiation of marketing within the United States. State whether the CJAM100, CJAM500, and CJAM1000 cell phone jammers were authorized in accordance with the Commission's certification procedures. If so, provide the FCC ID number for each. If not, state the basis for your authority to market these devices in the United States.

The Devices are not authorized under the certification procedures because Section 302(c) of the Act, 47 U.S.C. § 302(c), and Section 2.807 of the Rules, 47 C.F.R. § 2.807(d), exempt radio frequency devices intended for use by the Federal Government from the Commission's equipment authorization requirements.

7.     Section 302(c) of the Act, 47 U.S.C. § 302(c), and Section 2.807 of the Rules, 47 C.F.R. § 2.807(d), exempt radio frequency devices intended for use by the Federal Government from the Commission's equipment authorization requirements; however, such exemption does not extend to local and state governments. Explain under what authorization you believe you can market uncertified radio transmitting equipment (jammers) to local and state governments.

As indicated above, CellAntenna does not distribute the Devices to any local or state government in the United States, and markets the Devices only insofar as it has held a strict intention to distribute them in the United States to the extent permitted by the Act and Rules. CellAntenna does not believe it can market the Devices or similar equipment to local and state governments. As explained in Response No. 4, any past statement suggesting the contrary relied on informal guidance from FCC staff and occurred solely on a website that is obsolete and no longer used, was never promoted, and has since been disabled, and in any event involved precursors to the Devices as to which CellAntenna never had in inventory or distributed at any time.

Mr. Neal McNeil
September 13, 2005
Page 6 of 6



* * * *

    Attached hereto as Appendix E is the Declaration of Howard Melamed, President & CEO of CellAntenna Corporation, verifying the truth and accuracy of the information contained in the above responses.

If there are any questions, please contact the undersigned counsel for CellAntenna.

Sincerely,

Ronald G. London
Counsel to CellAntenna Corporation

Enclosures

## APPENDIX E

### Declaration of Howard Melamed

I, Howard Melamed, do hereby declare as follows:

1.   I am the President & Chief Operating Officer of CellAntenna Corporation.

2.   I have reviewed the representations in the foregoing response and believe them to be true and accurate to the best of my knowledge, information and belief.

3.   All of the Documents and information responsive to the specific inquiries in the foregoing response that are in my possession, custody, control or knowledge have been produced.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this ____12th____ day of September, 2005.



FEDERAL COMMUNICATIONS COMMISSION
Enforcement Bureau
Spectrum Enforcement Division
445 12th Street, S.W.
Washington D.C. 20554

October 26. 2005

**Via Facsimile and Certified Mail**

Mr. Howard Melamed
CellAntenna Corporation
9625 West Sample Rd
Coral Springs. FL 33065

Re:    EB-05-SE-176

Dear Mr. Melamed:

The Spectrum Enforcement Division (the "Division") of the Enforcement Bureau (the "Bureau") has been engaged in an investigation into allegations that CellAntenna Corporation ("CellAntenna") has marketed radiofrequency transmitting devices in violation of Part 15 of the Commission's rules. On August 24, 2005, the Division issued a Letter of Inquiry directing CellAntenna to submit certain documents and information to the Division.[1] CellAntenna submitted a response to the Division's Letter of Inquiry on September 13, 2005.

In its correspondence, CellAntenna indicated that the radiofrequency transmitting devices under investigation are not being marketed or sold in the United States to non-Federal Government entities. CellAntenna stated that has sold only two units, both to Federal agencies. Furthermore, CellAntenna noted that if it receives purchase inquiries from non-Federal Government buyers in the United States, it informs the inquirer that the products can only be purchased by the Federal Government.

---

[1] *See* Letter of Inquiry addressed to CellAntenna Corporation in file number EB-05-SE-176. In connection with the investigation. the LOI imposed certain continuing document retention and production obligations upon the company. This letter constitutes written notice that, with our closing of the investigation. those obligations of the company are hereby terminated.

This letter is to inform you that, at this time, the Bureau is not planning to take further action regarding these matters. Accordingly, we have closed this investigation. Just as you should not view the pendency of an investigation as a determination that a violation has occurred, you should also not construe the closing of the investigation as a determination that a violation did not occur. Moreover, the Bureau may take future action if the public interest so requires.

Please direct any questions regarding this matter to Neal McNeil at 202-418-2408.

Sincerely,

Joseph Casey
Chief. Spectrum Enforcement Division
Enforcement Bureau

2